UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

FREDERICK JAMES MAWSON,                          Case No. BT 18-05012
                                                 Chapter 7

    Debtor.

_____/

## OPINION GRANTING UNITED STATES TRUSTEE'S
## MOTION FOR REVIEW AND RETURN OF ATTORNEY COMPENSATION

Appearances:

Dean E. Rietberg, Esq., and Elizabeth K. Lamphier, Esq., Grand Rapids, Michigan,
    attorneys for the Office of the United States Trustee.

Dean E. Sheldon III, Esq., Traverse City, Michigan, former attorney for Debtor Frederick
    James Mawson.

Michael P. Hanrahan, Grand Rapids, Michigan, current attorney for Debtor Frederick
    James Mawson.

### I.       INTRODUCTION AND JURISDICTION.

This matter is before the court on the United States Trustee's motion for review and return of compensation paid to Attorney Dean E. Sheldon, III ("Sheldon") in the course of his representation of Debtor Frederick James Mawson ("Mawson" or the "Debtor"). Sheldon charged the Debtor $2,165, plus the $335 filing fee, for his services in this chapter 7 case. The Debtor's chapter 7 case was not a simple one. It involved several related adversary proceedings, including one that resulted in a determination that the Debtor owed Huntington National Bank an approximately $460,000 nondischargeable debt and one brought by the U.S. Trustee for denial of the Debtor's discharge under § 727

1

of the Bankruptcy Code.[1]  The U.S. Trustee's motion generally alleges that by limiting his representation of the Debtor in the adversary proceedings, failing to correct the inaccuracies in the Debtor's schedules that led to the filing of the action for denial of discharge, and committing other oversights and omissions, Sheldon failed to adequately represent the Debtor or to comply with his ethical obligations.  As a result, the U.S. Trustees argues that Sheldon's fees in this case were not reasonable and should be disgorged under § 329.

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a); LGenR 3.1(a) (W.D. Mich.).  This matter is a core proceeding, *see* 28 U.S.C. § 157(b)(2)(A), and this court has authority to enter a final order.

## II.    FINDINGS OF FACT AND PROCEDURAL BACKGROUND.

An evidentiary hearing on the U.S. Trustee's motion was held before this court on June 15, 2021.[2]  The hearing was conducted by Zoom videoconferencing due to on-going concerns relating to the Covid-19 pandemic, and all witnesses and attorneys appeared remotely.  Mawson, Sheldon, and Chapter 7 Trustee Kelly M. Hagan testified at the evidentiary hearing.  The court found Mawson and Hagan credible as witnesses but found Sheldon less credible given his unresponsive – and sometimes simply nonsensical – answers to questions on cross-examination.  In addition to his questionable credibility as a witness, Sheldon was extremely unprofessional in his representation of himself during

---

[1]    The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive.   Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

[2]    The transcript of the June 15, 2021 evidentiary hearing is at Dkt. No. 108, and is cited here in as "Tr. at ___."

the hearing.  On at least two separate occasions, the court was required to reprimand Sheldon for inappropriate laughter and for giving an audible reaction to the court's ruling on one of his objections.  (Tr. at 10; 27.)  The court found Sheldon's behavior at the hearing both disruptive and concerning.

At the hearing, the court also admitted the U.S. Trustee's Exhibits A through Z into evidence without objection.  Sheldon failed to file a witness list or to submit proposed exhibits by the deadlines established in the court's pre-hearing scheduling order. Therefore, Sheldon did not offer any exhibits into evidence at the hearing.  He did, however, provide brief narrative testimony on his own behalf, which the court permitted over the objection of the U.S. Trustee.  The following findings of fact are derived from the evidence presented at the hearing.

Mawson testified that he first consulted Sheldon about the possibility of filing for bankruptcy relief in June or July of 2018, after experiencing health issues which left him unable to work.  (Tr. at 19-20.)  He and Sheldon initially went through some "paperwork, intake and such," and he provided Sheldon with copies of documents listed on a Bankruptcy Client Checklist, including bank account statements, copies of recent utility bills, etc.  (Tr. at 23-24; Exh. P.)  After this initial meeting, Mawson explained that the filing was put on "hiatus" for the remainder of the summer, at least in part due to Sheldon's busy caseload.  Mawson testified that although he was ready to get his case filed around Labor Day, preparations for filing only started "ramping up" again in early November 2018. (Tr. at 20; 25.)  At that time, Mawson completed an Intake Questionnaire and returned it to Sheldon. (Exh. O; Tr. at 21.)  Among the assets and liabilities disclosed on the

questionnaire were real property and a vacant lot[3] with a value of $620,000 and a mortgage in favor of Quicken Loans with a payoff amount of $310,000.  (Exh. O.) Handwritten notes on the form indicate the property was held "In Wife's Name Only."  (*Id*.) It is not clear from the testimony who added those comments, but Mawson stated that other comments in the worksheet margins were added by Sheldon.  (Tr. at 22-23.)

Mawson's chapter 7 petition was eventually filed on December 3, 2018.  (Exh. C.) Sheldon charged $2,165, plus the $335 filing fee, for his services in the bankruptcy case. (Exh. D., Tr. at 41.)  The Rule 2016(b) Disclosure of Compensation of Attorney for Debtor states that Sheldon will "render legal services for all aspects of the bankruptcy case," including analysis of the Debtor's financial situation, preparation and filing of the petition, and representation of the Debtor at the § 341 meeting.  (*Id*. at ¶ 5.)  It specifically states that the disclosed fee "does not include . . . any contested matter."  (*Id*. at ¶ 6.)  The copy of the Rule 2016(b) disclosure that was admitted into evidence was electronically signed by Mawson.

Although there is no dispute about the amounts paid to Sheldon, or that they were accurately reflected in the Rule 2016(b) statement, Sheldon and Mawson gave conflicting testimony at the hearing as to whether they had executed a written contract or retention agreement.  Mawson testified that he did not believe he had signed a contract or retention agreement with Sheldon.  (Tr. at 41.)  Sheldon testified that that he had entered into a written fee agreement with Mawson and that he had a copy of the agreement.  (Tr. at 67.) Notwithstanding, it is undisputed that no such agreement was ever produced in this

---

[3]     The vacant lot was not listed separately on the questionnaire and was not identified by its separate street address.  However, boxes indicating that the real property included both a "House" and a "Vacant Lot" were checked on the form.  (Exh. O.)

contested matter.  (Tr. at 67-69.)  At the hearing, Sheldon offered several different excuses for this failure.[4]

Prior to the filing, Mawson explained that he signed the petition and accompanying documents during a fifteen to twenty minute meeting that took place around Sheldon's kitchen table.  (Tr. at 27; 30.)  Although he did not review the documents in detail before signing them, Mawson testified that he received a copy of the paperwork from Sheldon and read it more carefully later that day, after returning home.  (Tr. at 30.)  That review revealed several inaccuracies.  (*Id.*)  In particular, Mawson noticed that the schedules did not list a prior lawsuit that had been brought against him by Huntington National Bank.  (*Id.*)  On cross-examination at the hearing, Mawson acknowledged that he did not disclose the Huntington litigation to Sheldon prior to the filing date.  (Tr. at 45.)  However, Mawson explained that he emailed Sheldon almost immediately to request that this lawsuit be added to his schedules.  (Tr. at 31-33.)  An email dated December 5, 2018, just two days after the petition date, confirms that Mawson promptly brought this omission to Sheldon's attention.  (Exh. Q.)

Sheldon filed amended schedules on Mawson's behalf on March 4, 2019.  (Exh. F.)  The amendment added the vacant lot that was owned by the Debtor and his wife and claimed an exemption in that property.  (*Id.*)  It did not, however, reference the Huntington lawsuit.  (*Id.*)  An email reply from Sheldon to Mawson on March 14, 2019, which was several months after the filing date, reveals Sheldon's knowledge that the schedules were still incomplete and that the "Huntington lawsuit needs to be added."  (Exh. U.)  Mawson

---

[4]   These excuses ranged from potentially plausible ("I've had a new computer system") to entirely unsubstantiated ("My family is dying of COVID") and just plain bizarre (" . . . why are you sitting on a – a wire brush?") (Tr. at 67-69).

and Sheldon also exchanged several emails regarding other corrections that needed to be made to the schedules, particularly regarding Mawson's residence which had been transferred to his wife's trust sometime prior to the bankruptcy filing.  (Tr. at 33; Exhs. R – T.)

Mawson's difficulties only grew as the chapter 7 case continued.  On March 8, 2019, the U.S. Trustee filed an adversary proceeding against Mawson seeking to deny his discharge under § 727.  (Exhs. G & H.)  The complaint was based largely on errors and omissions in Mawson's schedules, including his failure to disclose the Huntington Bank lawsuit or to list Huntington as a creditor.  (Exh. H.)  Mawson testified that he was "shocked" when he was served with the U.S. Trustee's complaint, but that he spoke with Sheldon about it and was assured that Sheldon would "address it." (Tr. at 37.)  No answer was filed, and the Clerk entered a notice of default against Mawson in April 2019.  When Mawson was served with the U.S. Trustee's Motion for Entry of Default Judgment, he "panicked" and again spoke with Sheldon about the litigation.  At this point, he considered the possibility of retaining replacement counsel because Sheldon "wasn't comfortable with the adversarial portion of it."  (Tr. at 39.)  Mawson explained that Sheldon referred him to alternative counsel at that time.  (*Id*.)

Huntington National Bank also filed an adversary proceeding against Mawson in March of 2019, seeking a determination that the debt it was owed, in the approximate amount of $460,000, should be excepted from discharge under § 523(a)(2), (4) and (6). (AP No. 19-80029, Dkt. No. 1.)  In this adversary proceeding, Sheldon initially filed a letter acknowledging receipt and service of the summons and complaint and indicating that the parties had agreed to extend the time to answer.  (AP No. 19-80029, Dkt. No. 5.)  No

answer or other responsive pleading was filed, and the Clerk entered a notice of default against Mawson.  In June 2019, Huntington filed its motion for default judgment.

In May 2019, Mawson retained substitute counsel, Chase Bylenga Hulst, PLLC (now CBH Attorneys & Counselors, PLLC, referred to herein as "CBH"), to replace Sheldon. (Exh. I.)  According to the CBH disclosure of compensation, Mawson paid them a retainer of $22,641.95 for their services. (Exh. K.)  CBH helped the Debtor "start fresh" with his filing.  (Tr. at 42.)  They filed amended schedules and met with representatives from the U.S. Trustee's office to resolve the issues in the objection to discharge adversary proceeding.   That proceeding was ultimately dismissed in June 2019, pursuant to a stipulation between the parties.  The Debtor received his discharge on August 23, 2019. (Dkt. No. 54.)

CBH also filed a response to the motion for default judgment in the Huntington adversary proceeding.  That proceeding was resolved by entry of a consent judgment in December of 2019. (AP No. 19-80029, Dkt. No. 17.)

Finally, in June 2020, Trustee Hagan filed an adversary proceeding against Angela Mawson, the Debtor's former spouse, individually and as trustee of her living trust, seeking a judgment of approximately $218,000 for improper and fraudulent transfers made by the Debtor to Ms. Mawson.  (AP No. 20-80006, Dkt. No. 1.)  This adversary proceeding was settled in November 2020 pursuant to an agreement under which Ms. Mawson and the Debtor agreed to pay the chapter 7 estate $150,000.  (Dkt. No. 79.)  The Trustee filed her Notice of Intent to File Final Report on June 19, 2021.

The U.S. Trustee's motion asks this court to order Sheldon to return the $2,165 in fees he received from Mawson because the fees exceeded the value of Sheldon's services in this case.  The main allegations of the motion are that:  (a) the schedules and

statement of affairs were materially inaccurate, although Mawson had provided the requisite information to Sheldon that would have allowed for accurate completion of the documents, (b) Sheldon did not respond to the U.S. Trustee's complaint to deny Mawson's discharge, and (c) Sheldon did not counsel Mawson concerning the alternatives to chapter 7, including the potential of filing his case under chapter 13. Sheldon's response primarily pointed back to Mawson, suggesting that Mawson made false statements to him and that his Rule 2016(b) disclosure did not require him to represent Mawson in "any contested matters." Despite Sheldon's insistence that Mawson was not forthcoming with him throughout the case, the court notes that Sheldon had the opportunity to cross-examine Mawson at the hearing. Although Mawson acknowledged that the Huntington litigation was not disclosed to Sheldon pre-filing, Sheldon's questioning of Mawson elicited no other testimony to support his assertions that Mawson had given him false information or to otherwise impeach Mawson's credibility. (Tr. at 44-47.)

### III.    DISCUSSION.

The U.S. Trustee's motion was brought pursuant to § 329, which governs transactions between debtors and their attorneys. Section 329(a) requires debtors' attorneys to "file with the court a statement of the compensation paid or agreed to be paid . . . for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation." 11 U.S.C. § 329(a); s*ee also* Fed. R. Bankr. P. 2016(b) (implementing this requirement by requiring the attorney's statement to be filed and transmitted to the U.S. Trustee). If the compensation paid or agreed to be paid to the attorney "exceeds the reasonable value" of the attorney's

8

services, § 329(b) provides that the court may cancel the agreement or order return of the payment to the extent it was excessive.  In reviewing the reasonableness of attorney compensation under § 329, the burden of proof rests with the attorney.  *Thomas v. Robinson (In re Robinson)*, 189 F. App'x 371, 374 (6th Cir. Jun. 22, 2006) (unpublished opinion) ("The burden of proof on all issues under 11 U.S.C. § 329 is on the attorney . . . .") (citing *In re Geraci*, 138 F.3d 314, 318 (7th Cir. 1998)).  To meet this burden, the attorney must "come forward with the appropriate proof, such as the fee schedule, to establish that the fee is reasonable."  *Id*.

In addition, because the U.S. Trustee's motion alleges attorney misconduct, the court must evaluate the reasonableness of the fees charged in this case using the applicable rules of professional conduct as guideposts.  "Ethical rules involving attorneys practicing in federal courts are ultimately questions of federal law." *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 623 F. Supp. 2d 863, 876 (W.D. Mich. 2007) (citing *In re Snyder,* 472 U.S. 634, 645 n. 6, 105 S. Ct. 2874 (1985)) (additional citations omitted).  However, federal courts "are entitled to look to the state rules of professional conduct for guidance." *Id*.   As the U.S. District Court for the Western District of Michigan has observed, the "starting point" for reviewing attorney-client relationships in this district is the Michigan Rules of Professional Conduct (sometimes referred to herein as the "MRPC").  *Humboldt B.V. v. Lornic Design, Inc.*, Case No. 1:17-CV-983, 2019 WL 4931369, at *2 (W.D. Mich. July 23, 2019) (unpublished opinion).

A. <u>*Scope of Representation*</u>.

Sheldon's main argument is that the scope of his representation of Mawson was limited and that he was not required to assist Mawson in filing answers in the two

adversary proceedings.  As the sole evidence to support this argument, Sheldon points to his Rule 2016(b) disclosure which states that his representation of the Debtor excludes "any contested matters."  He alleges that this exclusion means he was not required to file answers or responsive pleadings to the adversary complaints on Mawson's behalf.

Limiting the scope of representation, or "unbundling" as it is sometimes called, has become increasingly popular in recent years as individuals in need of chapter 7 relief struggle to find ways to afford legal representation.[5]   Unbundling generally involves "limiting the scope of services that an attorney will provide – and dividing comprehensive legal representation into a series of discrete tasks, only some of which the client contracts with the lawyer to perform."  *Dignity Health v. Seare* (*In re Seare)*, 493 B.R. 158, 183-85 (Bankr. D. Nev. 2013) (noting that this practice potentially benefits "clients by giving them access to legal services that would otherwise be too expensive" and attorneys by making "representation more predictable, as well as more profitable" but also raises various ethical and practical concerns) (citations omitted).

The Michigan Rules of Professional Conduct and persuasive authority from within the Sixth Circuit interpreting § 329 make it clear that unbundling of legal services in bankruptcy cases is not per se prohibited but is also not always permitted.  *In re Slabbinck*, 482 B.R. 576, 589 (Bankr. E.D. Mich. 2012).  In *Slabbinck*, which the court finds persuasive, Judge Shefferly addressed a slightly different question than is presented

---

[5]     *See generally* Carrie A. Zuniga*, The Ethics of Unbundling Legal Services in Consumer Cases*, 32 Am. Bankr. Inst. J. 14 (Oct. 13, 2013) (explaining that "consumer bankruptcy attorneys' fees have increased by approximately 48 percent" since the enactment of the Bankruptcy Abuse and Consumer Protection Act of 2005; this increase, combined with the need to pay chapter 7 attorneys in full prior to the filing date has led to a "growing segment of debtors in bankruptcy who do not qualify for legal aid but are unable to raise the necessary funds in order to retain an attorney in full before filing a chapter 7 case") (citations omitted).

here, because the fee agreements in that case divided the services not by substance, but by timing.   That is, the specific type of unbundling at issue in *Slabbinck* involved a process by which the debtors and their attorney entered into two separate agreements:  a bare-bones pre-petition agreement under which the attorney provided legal advice to the debtors and filed the petition, and a separate post-petition agreement for services rendered after the filing of the petition.  *In re Slabbinck*, 482 B.R. at 580-81 (describing this as a "workaround" of the general rule that debts for attorney's fees under prepetition agreements are dischargeable in chapter 7).

After reviewing the MRPC, the official comments thereto, two Michigan ethics opinions that addressed limitations on representation in bankruptcy cases,[6] and the relevant caselaw cited by the parties, the *Slabbinck* court concluded that unbundling pre- and postpetition services in a chapter 7 proceeding is not necessarily prohibited.[7]  *In re*

---

[6]     The first of these Michigan Ethics Opinions, RI-184, is particularly relevant here because it addressed whether an attorney representing a chapter 7 debtor is also required to represent the debtor in an adversary proceeding filed during the bankruptcy case.  *See* Michigan Ethics Opinion RI-184 (Jan. 19, 1994), https://www.michbar.org/opinions/ethics/numbered_opinions/RI-184.   The State Bar of Michigan Standing Committee on Professional and Judicial Ethics concluded that adversary proceedings are within the scope of a lawyer's representation of a debtor unless they are "unambiguously" excluded under the representation agreement.  *Id*. at 1-2 ("if the retainer agreement is silent or ambiguous on the subject of representing a debtor client in bankruptcy adversary proceedings, the lawyer would be required to provide that representation").  The Committee reasoned that it "is not the client's responsibility to know, without it being explained, that adversary proceedings may occur and the consequences arising from them." *Id*. at 2.  Accordingly, if a lawyer intends "to exclude representation of the debtor in bankruptcy adversary proceedings," the lawyer should so specify and give "the client the opportunity to seek counsel who may offer representation on other terms." *Id.* at 1-2.

[7]     Despite this conclusion, the *Slabbinck* court expressed "a very strong preference to see individual debtors hire an attorney to represent them in all aspects of a Chapter 7 bankruptcy case, from start to finish, including the preparation and filing of the petition and all required documents together with all of the steps necessary to complete the case after the petition has been filed." *Id*. at 596.  This court shares that strong preference,

11

*Slabbinck*, 482 B.R. at 589.  The court emphasized, however, that any such unbundling must be carefully done only after thorough consultation and an express agreement with the client.  At a minimum, the court opined that "the MRPC require that (1) the attorney competently represents the individual debtor despite any limitation on the scope of services; (2) the attorney provides adequate consultation to the individual debtor concerning any limitation on the scope of the attorney's representation and the legal matter in question; and (3) the individual debtor makes a fully informed and voluntary decision to consent to such limitation."  *Id.* at 589.  In this context, adequate consultation "requires the attorney to explain that the attorney is limiting the scope of representation and to explain the technical aspects of [the services not being provided], and the legal ramifications, material risks and available alternatives."  *Id*. at 594 (citing Michigan Ethics Opinion RI-348).

In 2018, a few years after *Slabbinck* was decided, the Michigan Supreme Court amended Rule of Professional Conduct 1.2 to specifically allow for limited scope representation "if the limitation is reasonable under the circumstances and the client gives informed consent, preferably confirmed in writing."  Mich. Rule of Prof'l Conduct 1.2(b). The MRPC define "informed consent" as denoting "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  Mich. Rule of Prof'l Conduct 1.0 cmt.

---

and the discussion of limited scope representation in this opinion should not be construed as an endorsement of the practice.

The above authorities clearly establish that an attorney may limit the scope of his or her representation in certain circumstances, but only if the limitation is reasonable, does not interfere with the attorney's other ethical obligations (including the duty of competence under MRPC 1.1) and only after the attorney consults with the client about the limitations and obtains the client's informed consent to such limitations.  In this case, other than pointing to his Rule 2016(b) statement, Sheldon presented no evidence to establish that he consulted with Mawson about the exclusion of adversary proceedings or other contested matters from the representation.  He offered no additional exhibits, such as a retainer agreement, to establish that Mawson was aware of any alleged limitations on the representation.  Nor did he offer any testimony of his own, or elicit any from Mawson on cross-examination, to suggest that he ever discussed the limitations on the scope of his representation with Mawson at all, much less that he provided adequate consultation about the risks of, or alternatives to, such limitations.

The record before the court is similarly insufficient to show that Mawson consented to the limitations on the representation.  The only evidence that might possibly establish Mawson's consent is the Rule 2016(b) disclosure, which includes a general reference to the exclusion of "contested matters" and which bears Mawson's electronic signature. Given Sheldon's failure to produce a more detailed retainer agreement, and in light of Mawson's description of the hurried signing of his bankruptcy documents around Sheldon's kitchen table, the court is hesitant to conclude that the Rule 2016(b) statement demonstrates Mawson's consent.  Even it if did, the court has no trouble finding that the document does not establish the Mawson made a fully informed and voluntary decision

13

to consent to the exclusion of adversary proceedings from Sheldon's representation of him in the chapter 7 case.[8]

 If anything, the weight of the evidence points in the other direction.   Mawson's testimony was that he was "shocked" when the U.S. Trustee filed the complaint to deny his discharge, that he discussed it with Sheldon, and that he believed Sheldon would address it.   He further testified that he "panicked" when he received a copy of the motion for default judgment, and that it was only after subsequent conversations with Sheldon that he realized he needed to retain substitute counsel because Sheldon was not comfortable handling adversary proceedings.   In the Huntington Bank adversary proceeding, Sheldon began assisting Mawson with the litigation by filing a letter with the court indicating his acknowledgment of service and setting forth an agreement to extend the deadline to answer the complaint.   He then abandoned Mawson once again, an action that eventually left Mawson in default.   Mawson's testimony and Sheldon's actions in the Huntington adversary proceeding belie Sheldon's assertion that he effectively excluded these services form his scope of representation.

For these reasons, the court finds that Sheldon did not adequately counsel Mawson on the proposed limitations to his representation and that Mawson did not make a fully informed and voluntary decision to consent to the exclusion of the Huntington Bank and U.S. Trustee adversary proceedings from Sheldon's representation of him in the

---

[8]    *Compare, e.g., In re Hazlett*, 2019 WL 1567751, *8 (Bankr. D. Utah Apr. 10, 2019) (discussing bifurcated fee agreements under the Utah Rules of Professional Conduct and stating that the propriety of such agreements "is directly proportional to the level of disclosure and information the attorney provides to the client, and the existence of documentary evidence that the client made an informed and voluntary election" to enter into the agreements; the court held that the detailed written disclosures provided by the lawyer, and signed in ink by the debtor, "satisfied the requirements of full disclosure and informed consent").

bankruptcy case.   As a result, Sheldon's attempt to limit his representation of the Debtor failed.  This failure nearly had disastrous consequences for the Debtor, including placing him on the brink of losing his chapter 7 discharge.   Under the circumstances, disgorgement of Sheldon's attorney fees is justified under § 329.

B. *Duty of Competence*.

In addition to the issues regarding the alleged limitations on the scope of Sheldon's representation, the U.S. Trustee's motion also raises questions about whether Sheldon competently performed the legal services he clearly agreed to undertake.   MRPC 1.1 provides:

> A lawyer shall provide competent representation to a client. A lawyer shall not:
> (a) handle a legal matter which the lawyer knows or should know that the lawyer is not competent to handle, without associating with a lawyer who is competent to handle it;
>
> (b) handle a legal matter without preparation adequate in the circumstances; or
>
> (c) neglect a legal matter entrusted to the lawyer.

Mich. Rule of Prof'l Conduct, 1.1.

In this case, one of the primary concerns about Sheldon's competence in providing legal services to the Debtor centers around the real property and vacant lot disclosed on Mawson's prebankruptcy worksheets.  According to the documents, the property was worth $620,000, was subject to a $310,000 mortgage, and was held in the name of Mawson's former spouse.   The Trustee ultimately sued Ms. Mawson and her trust, alleging that she received the property via a fraudulent transfer.  This lawsuit settled after Mawson retained substitute counsel, pursuant to an agreement which required Ms. Mawson and the Debtor to pay the chapter 7 estate $150,000.

15

The court finds it incredible that with the prebankruptcy disclosure of real property showing on its face equity of nearly $290,000, there was no discussion of the risks of filing a chapter 7 case, the responsibility to fully disclose ownership of the real property and any prior transfers or the property, and options other than chapter 7, such as filing under chapter 13 or non-bankruptcy alternatives.  This would be true regardless of whether the real property was owned by the Debtor, given the amount of likely nonexempt equity, or owned by his wife.  In fact, the Trustee was obviously aware of questions about ownership of the real estate even prior to the initial § 341 meeting.  (See Exh. E (email from Trustee Hagan's office to Sheldon, inquiring about several issues including ownership of the real property and requesting further documentation)).  Subsequent emails between Mawson and Sheldon reveal that it was only after the Trustee raised questions about the property at the § 341 meeting that Sheldon conducted a further analysis of the real property and options for addressing it (such as by conveying the property from the trust back to Mawson and his spouse, as husband and wife).  (See Exhs. R-T.)  When presented with these disclosures before the bankruptcy petition was filed, Sheldon had an absolute duty to Mawson to advise him concerning these issues, how they could give rise to exemption and/or fraudulent conveyance issues with the Trustee and creditors, and alternatives to filing for chapter 7 relief.   Had that analysis and communication occurred, it is possible that Mawson may have understood the risks and opted to file the chapter 7 case.  Or he may have sought other alternatives.   But that communication did not happen here. According to Mawson's testimony at a prior Rule 2004 exam, chapter 13 was not discussed at all, and he "was pigeonholed" into a chapter 7 bankruptcy.  (See Exh. N at page 39.)   This failure was in derogation of Sheldon's duty of competence and, combined

16

with the other issues addressed in this opinion, justifies disgorgement of Sheldon's fees under § 329.

C. *Other Issues Raised by the U.S. Trustee*.

The U.S. Trustee raised other issues in its motion, including whether the information contained in the bankruptcy schedules and statements was stale given the time lapse between when Mawson gave Sheldon the requisite information to file the petition and when the case was actually filed, Sheldon's non-inclusion of certain information in the original schedules, or Sheldon's failure to promptly amend schedules after receiving supplemental information from Mawson.   For instance, Mawson testified that he had provided his financial information to Sheldon between July and September 2018, and that he expected the petition to be filed around Labor Day.  That did not occur. Instead, according to Mawson's testimony, he and Sheldon only began "ramping up" for the filing in early November; and even then, the case was not filed until nearly a month later, on December 3, 2018.  Mawson also testified that he had asked Sheldon to amend his bankruptcy schedules and statements as early as December 5, 2018, to disclose the prepetition Huntington Bank litigation.  (*See also* Exh. Q.)  Sheldon took no actions to amend the schedules or Statement of Financial Affairs to disclose the Huntington claim and litigation; they were only amended to disclose the Huntington claim and litigation in July 2019, which was after CBH took over as Mawson's attorney.  These issues, while perhaps not significant enough to result in disgorgement of fees standing alone, certainly add to the accumulation of evidence in support of the U.S. Trustee's motion.

17

IV.   <u>CONCLUSION</u>.

Under § 329(b), the burden is on Attorney Sheldon to demonstrate that the compensation he was paid in this case did not exceed the reasonable value of his services.  Sheldon did not meet that burden.  Perhaps some of the services provided by Sheldon were compensable.  But he was given an opportunity to present evidence to establish what those might have been, and he failed to do so.  In fact, Sheldon offered the court no testimony, no exhibits, and no evidence whatsoever to support that any of his fees were reasonable.  The evidence presented at the hearing clearly established that the Debtor did not give informed consent to the limited scope of Sheldon's representation, and the record was equally clear that Sheldon did not competently represent the Debtor in the course of this case.   As a result, the court concludes that the compensation paid Sheldon exceeds the reasonable value of any services he rendered, and the court will order that Sheldon disgorge the $2,165 in attorney's fees he was paid to the Debtor.   An order consistent with this opinion shall enter accordingly.  Further, and in accordance with LBR 9010-1(b), the court shall enter a separate order requiring Sheldon to show cause why he should not be subject to further discipline given this court's findings and conclusions in this matter, as well as given Sheldon's conduct, outbursts, and antics during the evidentiary hearing.

**IT IS SO ORDERED.**

**Dated September 7, 2021**





James W. Boyd
United States Bankruptcy Judge